1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHNMANUEL GURROLA,

           Plaintiff,

  vs.

MICHAEL J. ASTRUE, Commissioner of Social
Security,

           Defendant.

_____/

No. C 10-3672 MEJ

**ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**ORDER GRANTING DEFENDANT'S
CROSS-MOTION FOR SUMMARY
JUDGMENT**

## I.  INTRODUCTION

Plaintiff Johnmanuel Gurrola ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g),
seeking judicial review of the decision of the Commissioner of Social Security, Defendant Michael
J. Astrue ("Defendant"), denying his claim for disability insurance benefits.  Pending before the
Court are the parties' cross-motions for summary judgment.  (Dkt. ## 12, .)  Having read and
considered the parties' papers, the administrative record below, and the relevant legal authority, the
Court hereby DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-
motion for summary judgment for the reasons set forth below.

## II.  BACKGROUND

**A.**    **Education and Work Experience**

Plaintiff was born on May 2, 1966.  (Administrative Record ("AR") 91.)  He completed high
school and took some general education courses at Santa Rosa Junior College.  (AR 27.)  His past
work experience includes advertisement sales, jewelry sales, and a regional branch manager for an
auto parts business.  (AR 127.)

**B.      Medical History**

Plaintiff's disability application is based on neck, back, and arm pain that he seems to have suffered since at least 2005.  (AR 17, 28, 30.)  In his application, Plaintiff states that he became unable to work as of October 29, 2005.  (AR 91)  The record shows that Plaintiff underwent treatment, including physical therapy, as far back as July 2005 and that, although he had back surgery in 2007, he testified that the symptoms grew worse.  (AR 31.)  The following is a summary of Plaintiff's medical history as provided in the administrative record.

From July 26, 2005, and continuing through October 31, 2005, Plaintiff saw Kris Henry, F.N.P., for a variety of ailments, including dizziness and joint pain.  (AR 289-98.)  The nurse practitioner diagnosed generalized anxiety disorder and vertigo.  (AR 289-98.)  However, as neither party addresses these visits, they do not appear directly related to Plaintiff's current claim.

On January 3, 2006, Harry Phillips, M.D., reported findings based on a complete lumbar spine x-ray series.  (AR 172.)  Dr. Phillips found "a small old ununited limbic fracture of the upper anterior L5 vertebral body," but found all other areas - alignment, disk spaces, facets, soft tissues, and SI joints - were normal.  (AR 172.)  Dr. Phillips reached the following conclusion: "Small limbic fracture, remote temporally, L5. No other specific pathology."  (AR 172.)

On February 14, 2006, Robert Feiwell, M.D., reported on the findings of an MRI of Plaintiff's lumbar spine.  (AR 171, 287.)  Dr. Feiwell found that Plaintiff's lumbar disk levels were "Normal" at the L1-2, L2-3, L3-4, and L4-5 levels, but found that the L5-S1 level had "[m]ild disk desiccation, right lateral recess protrusion approximately 4 mm in AP dimension, likely compressing the traversing right S1 root."  (AR 171, 287.)

On March 6, 2006, Patrick Kam, P.T., prepared a plan of care based on Plaintiff's complaints of right buttock and posterior thigh pain, and numbness and tingling.  (AR 285-86.)  Mr. Kam stated that Plaintiff's prognosis was "good to meet goals," and placed him on a treatment plan including a home exercise program, joint mobilization to the lower lumbar as needed, soft tissue mobilization to the low back, right gluteal and hamstring, and therapeutic/kinetic exercises for trunk stabilization and conditioning.  (AR 286.)

**United States District Court**
For the Northern District of California

On January 15, 2007, Kevin K. Howe, M.D., performed an orthopaedic consultation.  (AR 183, 203, 323-24.)  Plaintiff presented with numbness and tingling in the right upper extremity and some neck pain, as well as discomfort in his right knee.  (AR 183, 323.)  Dr. Howe noted that Plaintiff's right grip is weaker than his left, even though he is right-hand dominant, but no serious limitations to his range of motion in his right shoulder, right elbow, right knee, and neck.  (AR 183, 323.)  Dr. Howe stated that he was "worried about some type of nerve entrapment in [Plaintiff's] right upper extremity," and recommended MRI and EMG studies.  (AR 203, 324.)

On February 1, 2007, Scott Booth, M.D., completed an evaluation of Plaintiff's C-spine MRI.  (AR 204-05.)  The MRI revealed the following impressions:

> 1) Moderate severity central spinal stenosis at C5-6, secondary to broad central disc bulge.  Mild right neural foraminal stenosis.
>
> 2) Mild-to-moderate severity central spinal stenosis at C6-7, secondary to left lateralizing disc ridge complex.  Left neural foraminal stenosis.
>
> 3) Minimal central spinal encroachment at C3-4, secondary to a tiny central disc protrusion.  Mild bilateral neural foraminal encroachment.
>
> 4) Minimal left neural foraminal narrowing at C4-5, secondary to uncovertebral joint spurring

(AR 205.)

On February 7, 2007, Plaintiff saw Dr. Howe for a follow-up on his right knee MRI and cervical MRI.  (AR 202, 322.)  Dr. Howe noted that the MRI of his neck showed "pretty significant stenosis at multiple levels," and that the MRI of his knee was normal.  (AR 202.)  Dr. Howe gave the following impression: "Cervical spine stenosis with bilateral upper extremity pain," and recommended a nerve conduction study and EMG of Plaintiff's right upper extremity.  (AR 202, 322.)  Dr. Howe subsequently referred Plaintiff to Paul A. LaHaye, M.D., for a neurological consultation.  (AR 240.)

On February 12, 2007, Dr. LaHaye completed his initial evaluation, finding that Plaintiff had significant degenerative disk disease with central and foraminal stenosis at C5-6 and C6-7.  (AR 240-42.)  Dr. LaHaye sent Plaintiff for a trial of physical therapy, including traction, and recommended that he return in one month to assess his response to physical therapy.  (AR 242.)

**United States District Court**
For the Northern District of California

On February 13, 2007, Kevin M. Satow, M.D., completed an Electrodiagnostic Evaluation. (AR 184-87.)  Dr. Satow completed electrodiagnostic studies of Plaintiff's right upper extremity, and provided the following impressions:

> 1. Abnormal examination.  There is electrophysiologic evidence consistent with a developing right median mononeuropathy at the wrist.  At present this right carpal tunnel syndrome appears moderate in degree.
>
> 2. There is no electrophysiologic evidence consistent with a developing right ulnar neuropathy at Guyon's canal or the cubital tunnel.
>
> 3. There is no electrophysiologic evidence consistent with a denervating right cervical radiculopathy or brachial plexopathy.

(AR 187.)

Beginning on February 19, 2007, and continuing through May 2007, Plaintiff treated with Robert Leavitt, P.T., for physical therapy.  (AR 188-89, 192-96, 198-99, 333.)  On March 12, 2007, Mr. Leavitt reported to Drs. LaHaye and Howe that Plaintiff had made progress with his rehabilitation and had increased tolerance to function.  (AR 194.)  Mr. Leavitt noted that pain and complaints of dizziness still limited some activities, especially prolonged activities, but he instructed Plaintiff in a home exercise program for cervical stabilization and flexibility, and right shoulder muscle strengthening and stretching.  (AR 194.)  On May 2, 2007, Mr. Leavitt reported that Plaintiff had made steady progress, but he still had complaints of "tightness" in the right elbow with increased activity.  (AR 199, 333.)  Mr. Leavitt noted that all previous activities had been resumed without significant pain, and that Plaintiff had been instructed in a home cervical traction, exercise, and stretching program as Plaintiff was "confident enough to continue on his own."  (AR 199, 333.)  Mr. Leavitt discharged skilled therapy as of that date.  (AR 199, 333.)

On March 28, 2007, Plaintiff returned to Dr. LaHaye for an evaluation.  (AR 243.)  Dr. LaHaye noted that Plaintiff had been carrying on with physical therapy efforts as prescribed and seemed to be making progress.  (AR 243.)  Plaintiff indicated that he felt "50% better" than he had been, though he still had pain and aching, particularly on the right side on the dorsoradial aspect of

1   his forearm and hand, but the physical therapy efforts seemed to be helping him.  (AR 243.)  Dr.

2   LaHaye explained to Plaintiff that his clinical syndrome was multifactorial, but most of it stemmed

3   from the cervical spine, and the fact that he responded to physical therapy corroborated that.  (AR

4   243.)  Dr. LaHaye encouraged Plaintiff to continue physical therapy efforts for another four weeks,

5   and if his condition continued to improve he would not have to worry about surgery.  (AR 243.)

6        On May 8, 2007, Plaintiff met Dr. LaHaye for a followup appointment.  (AR 238-39.)  Dr.

7   LaHaye noted that Plaintiff had continued bilateral upper extremity pain and paresthesia that is

8   posture sensitive, and that his functional capacity was significantly decreased.  (AR 238.)  Dr.

9   LaHaye reviewed Plaintiff's MRI scan and found a C6-7 disk herniation and C5-6 degenerative disk

10  disease with foraminal stenosis.  (AR 238.)  Given Plaintiff's lack of response to conservative

11  management efforts such as physical therapy, Dr. LaHaye informed Plaintiff that he was a candidate

12  for surgery; specifically, C5-6 anterior cervical disk excision and interbody fusion with allograft and

13  internal fixation with an anterior cervical locking plate.  (AR 238.)

14       On May 17, 2007, Dr. Howe saw Plaintiff for a follow-up and gave the following

15  impressions: (1) Right moderate carpal tunnel syndrome; and (2) Severe spinal stenosis in the

16  cervical area.  (AR 201, 321.)  Dr. Howe noted that Dr. LaHaye recommended surgery, and that he

17  thought he should "go along with what the neurosurgeons say" because his neck was "pretty bad"

18  and the numbness and weakness was progressing.  (AR 201, 321.)

19       On August 28, 2007, Dr. LaHaye completed a preoperative followup.  (AR 234.)  Dr.

20  LaHaye noted that, since his last visit on May 8, 2007, Plaintiff had not responded to long-term

21  conservative management efforts, and that he continued to have bilateral upper extremity pain and

22  paresthesis.  (AR 234.)  Dr. LaHaye also found no clinical or neurologic change in his condition,

23  finding persistent cervical radiculopathy with a C5-6 disk herniation and C5-6 degenerative disk

24  disease and foraminal stenosis.  (AR 234.)

25       On August 31, 2007, Plaintiff underwent the recommended surgery.  (AR 207-08.)  Eldan B.

26  Eichbaum, M.D.,  performed a C5-6 and C6-7 disk excision and fusion with allograft bone and

27  anterior plate fixation.  (AR 207.)  Dr. Eichbaum completed the following evaluation after the

28

surgery:

> [Plaintiff] tolerated the procedure well. He had normal strength in bilateral upper and lower extremities postoperatively. An anteroposterior and lateral cervical spine x-ray performed postoperatively demonstrated excellent placement of the instrumentation and bone graft. He had some soreness of the throat postoperatively, which was treated with Cepacol spray. This improved on the second postoperative day. He had a drain removed on the first postoperative day without event. He was afebrile with normal vital signs throughout his hospital course. On the second postoperative day he was taking PO better, he was feeling better, his pain was well controlled with PO pain medications, and he was therefore discharged.

(AR 207.)  Dr. Eichbaum discharged Plaintiff on September 2, 2007, informing Plaintiff that he was to keep the incision dry for 10 days and not perform any lifting, twisting, or bending.  (AR 207-08.) Dr. Eichbaum provided the same diagnosis both pre and post-surgery – "Cervical spondylosis, stenosis, radiculopathy."  (AR 207.)

On October 2, 2007, Dr. LaHaye completed a postoperative followup.  (AR 237.)  He noted that Plaintiff was "clinically getting along well," and had sustained relief of his preoperative radicular symptomatology, though he did have some occasional aching in the right upper extremity. (AR 237.)  Dr. LaHaye stated that he was pleased with Plaintiff's outcome on both clinical and radiographic grounds, and he recommended a course of physical therapy.  (AR 237.)  Dr. LaHaye referred Plaintiff to the Redwood Regional Medical Group for cervical spine x-rays.  (AR 233.) Mark J. Popovich, M.D., found that Plaintiff's alignment, disk spaces, and soft tissues were normal, and that no complications were detected from the surgery.  (AR 233.)

On October 18, 2007, Dr. LaHaye completed a "Documentation for Letter of Medical Necessity."  (AR 330-31.)  Dr. LaHaye provided the following functional limitations: (1) unable to sit more than 30 minutes; (2) unable to drive more than 30 minutes; (3) unable to lift more than 25 pounds; and (4) unable to push/pull more than 50 pounds.  (AR 331.)  Dr. LaHaye recommended that Plaintiff begin physical therapy post-surgery, and that he receive instruction to make him independent in a dynamic stabilization home exercise and stretching program.  (AR 331.)

On November 1, 2007, Thien P. Nguyen, M.D., completed a Physical Residual Functional Capacity ("RFC") Assessment.  (AR 214-19.)  Dr. Nguyen found that Plaintiff could occasionally

United States District Court
For the Northern District of California

1    lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of

2    about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, had

3    unlimited pushing and pulling capabilities, except as noted for lifting and carrying. (AR 215.) Dr.

4    Nguyen concluded that Plaintiff had no manipulative, visual, communicative, or environmental

5    limitations, but did find that Plaintiff should only occasionally climb stairs and never climb ladders,

6    ropes, or scaffolds. (AR 217-18.) In support of this conclusion, Dr. Nguyen noted that there was no

7    apparent complication from Plaintiff's August 31, 2007 surgery and that Plaintiff was very active,

8    including light cleaning, vacuuming, and dishes. (AR 215-16.) Dr. Nguyen recommend the

9    following RFC: "light w/ post. limitation is appropriate at this time." (AR 216.)

10          On November 13, 2007, Dr. LaHaye completed a postoperative followup. (AR 235-36, 272-

11   73.) Dr. LaHaye stated that he explained to Plaintiff that it was very important that he undergo a

12   course of physical therapy employing multimodality techniques, as he had prescribed the previous

13   month, recommending that he go at least 2-3 times per week for 3-4 weeks as part of his

14   postoperative convalescence. (AR 272.) Plaintiff responded that he had not attended physical

15   therapy because it would not be approved by his carrier, but he told Dr. LaHaye he would follow up

16   with the carrier. (AR 235, 272.) Dr. LaHaye noted that Plaintiff was "well decompressed and

17   fused." (AR 236, 273.) Dr. LaHaye again referred Plaintiff to the Redwood Regional Medical

18   Group for cervical spine x-rays. (AR 232.) David H. Schmidt, M.D., found that Plaintiff's

19   alignment, disk spaces, and soft tissues were normal, and noted no specific abnormality or interval

20   change since the prior x-rays on October 2, 2007. (AR 232.)

21          On January 1, 2008, Plaintiff met with Dr. Howe for complaints of numbness and tingling in

22   his right hand. (AR 320.) Dr. Howe diagnosed potential carpal tunnel issues and referred Plaintiff

23   to Michael W. Grafe, M.D. (AR 320.) Dr. Grafe subsequently examined Plaintiff on July 3, 2008.

24   (AR 318-19.) Dr. Grafe made the following impression:

25          1.   Patient without any signs of right carpal tunnel syndrome at the
                present time.
26          2.   Patient with residual neck complaints, which mainly include posterior
                neck pain and right side neck fatigue.

27

28                                          Page 7 of  23

United States District Court
For the Northern District of California

(AR 318.)

Dr. Grafe told Plaintiff that the exam showed no significant signs of carpal tunnel syndrome and that, although his surgery was successful, the symptoms he showed seemed to be mild and related to the surgery.  (AR 319.)  Dr. Grafe recommended Plaintiff follow up with Dr. Eichbaum to address his current symptoms.  (AR 319.)

From January 7, 2008 through March 25, 2008, Plaintiff underwent a total of 16 physical therapy treatments with Robert Leavitt.  (AR 334, 336, 337.)  On February 26, 2008, Mr. Leavitt completed a Physical Therapy Progress Report, indicating that Plaintiff was making progress and demonstrated increased tolerance to function from initial values.  (AR 336, 337.)  Mr. Leavitt noted that strength, neural tension signs, and range of motion were improving but pain and paresthosia still limited some activities.  (AR 336, 337.)  Mr. Leavitt completed a Physical Therapy Discharge Report on March 25, 2008.  (AR 334.)  Mr. Leavitt noted that Plaintiff had made steady progress with physical therapy, and that he no longer had significant complaints of "tightness" in the right elbow or shoulder.  (AR 334.)  Mr. Leavitt reported that Plaintiff's strength tests rated at 4+/5 throughout with good muscular endurance, that all previous activities had been resumed without significant pain, dysfunction, or radiculopathy, and that 4 of 4 long-term goals were met.  (AR 334.) Mr. Leavitt discharged Plaintiff with a home exercise and stretching program.  (AR 334.)

On January 22, 2008, Mr. Leavitt completed a SSA Medical Source Statement of Ability to do Work-Related Activities.  (AR 244-50.)  Based on his previous physical therapy work with Plaintiff, Mr. Leavitt determined that Plaintiff: (1) could lift and carry 10 pounds frequently and 20 pounds occasionally, but never lift and carry more than 20 pounds (AR 244); (2) could sit, stand, and walk for 8 hours, but would need to change positions between the activities as often as every one hour (AR 245); (3) had no limitations in the use of his left hand, but cervical radiculopathy limited the use of his right hand to occasional reaching and push/pull functions, and frequent (not continuous) handling, fingering, and feeling (AR 246); (4) had no limitations on the use of his feet (AR 246); could never climb ladders or scaffolds, or crawl, but could frequently climb stairs,

United States District Court
For the Northern District of California

1   balance, stoop, kneel, and crouch (AR 247); (5) could continuously tolerate exposure to humidity,

2   wetness, extreme cold, and extreme heat, could frequently tolerate exposure to unprotected heights,

3   occasionally tolerate exposure to moving mechanical parts, operating a motor vehicle, and dust,

4   odors, and fumes, and never tolerate vibrations (AR 248); and could not sort, and handle, and use

5   paper/files, although he could shop, travel without assistance, ambulate without a wheelchair, use

6   public transportation, climb steps at a reasonable pace, prepare meals and feed himself, and care for

7   his personal hygiene (AR 249).  On July 1, 2008, Dr. Howe completed the same SSA medical source

8   statement ("MSS").  (AR 251-56.)  Dr. Howe's assessment provides for the same functional

9   capabilities and limitations as Mr. Leavitt's.

10       On March 5, 2009, Dr. Howe completed a physical examination, noting that Plaintiff

11  complained of numbness and tingling in his left upper extremity and decreased neck range of

12  motion.  (AR 317.)  Dr. Howe diagnosed post cervical decompression and left upper extremity

13  numbness.  (AR 317.)  Dr. Howe recommended Plaintiff see Dr. Eichbaum for evaluation of his

14  neck.  (AR 317.)  Dr. Howe stated that Plaintiff was unable to work from February 2007 through

15  August 2007.  (AR 317.)

16       On March 17, 2009, Dr. Eichbaum completed a Cervical Spine Residual Functional Capacity

17  Questionnaire.  (AR 325-29.)  Dr. Eichbaum noted that he had seen Plaintiff every 3-4 months for

18  over two years and stated that his prognosis was "fair-good."  (AR 325.)  Dr. Eichbaum found

19  Plaintiff's cervical range of motion to be 30% for extension, flexion, right rotation, and right lateral

20  bending, and 20% for left rotation and left lateral bending.  (AR 325.)  He also noted that Plaintiff

21  had severe headache pain, which occurred every day for 3-4 hours, and intermittent vertigo.  (AR

22  326.)  As for a typical workday, Dr. Eichbaum opined that Plaintiff was capable of low stress jobs,

23  but his pain symptoms were severe enough to interfere with attention and concentration needed to

24  perform work tasks on occasion.  (AR 327.)  Dr. Eichbaum provided the following functional

25  limitations: sit 30 minutes at one time before needing to get up; stand 30 minutes at one time; sit,

26  stand, and walk for about 4 hours in an 8-hour workday; walk for 5 minutes every 45 minutes in an

27  8-hour workday; a job that permits shifting positions at will; 2-3 breaks for 10 minutes in an 8-hour

28

1   workday; occasionally lift up to 20 pounds and rarely lift 50 pounds; occasionally hold his head in a

2   static position and rarely look down, turn head left or right, or look up; occasionally climb ladders

3   and stairs, rarely twist and crouch/squat, and never stoop/bend; and likely to be absent from work

4   three or more days per month because his impairments were likely to cause "good days" and "bad

5   days."  (AR 327-29.)

6   **C.      Procedural Background**

7           On August 17, 2007, Plaintiff completed an application for disability insurance benefits,

8   alleging disability beginning on October 29, 2005.  (AR 47, 91-92.)  Plaintiff was 41 years old at the

9   time he filed his application.  (AR 91.)  On November 2, 2007, the Social Security Administration

10  ("SSA") initially denied his application, (AR 49-53), and denied it upon reconsideration on April 11,

11  2008 (AR 57-61).  Plaintiff filed a timely request for hearing on May 27, 2008.  (AR 62-63.)

12          On March 19, 2009, Administrative Law Judge ("ALJ") Thomas P. Tielens heard the case.

13  (AR 14.)  Plaintiff appeared at the hearing represented by his then-attorney, Matthew Shondel.  (AR

14  14.)  Malcolm Brodzinsky, M.A., testified as an impartial vocational expert.  (AR 14.)  On May 20,

15  2009, ALJ Tielens concluded that Plaintiff was not disabled under the Social Security Act.  (AR 22.)

16  ALJ Tielens' decision became the final decision of the Commissioner when the Appeals Council

17  declined to review it on May 15, 2010.  (AR 6-7.)

18  **D.      The ALJ's Findings**

19          The regulations promulgated by the Commissioner of Social Security provide for a five-step

20  sequential analysis to determine whether a Social Security claimant is disabled.  20 C.F.R. §

21  404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The sequential inquiry is terminated

22  when "a question is answered affirmatively or negatively in such a way that a decision can be made

23  that a claimant is or is not disabled."  *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990).

24          The ALJ must first determine whether the claimant is performing "substantial gainful

25  activity," which would mandate that the claimant be found not disabled regardless of medical

26  condition, age, education, and work experience.  20 C.F.R. § 404.1520(b).  "Substantial work

27  activity" is work that involves doing significant physical or mental activities.  20 C.F.R. §

28

**United States District Court**
For the Northern District of California

1   404.1572(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a

2   profit is realized. 20 C.F.R. § 404.1572(b). Here, ALJ Tielens determined that Plaintiff had not

3   performed substantial gainful activity since October 29, 2005. (AR 16.)

4        At step two, the ALJ must determine, based on medical findings, whether the claimant has a

5   "severe" impairment or combination of impairments as defined by the Social Security Act. 20

6   C.F.R. § 404.1520(a)(ii). "Severe" means any impairment or combination of impairments that

7   significantly limits the claimant's physical or mental ability to perform basic work activities. 20

8   C.F.R. §§ 404.1520(c), 416.920(c). This is a de minimis inquiry designed to weed out

9   nonmeritorious claims at an early stage in the analysis. *Bowen v. Yuckert*, 482 U.S. 137, 148, 153-

10  54 (1987). Thus, "only those claimants with slight abnormalities that do not significantly limit any

11  basic work activity can be denied benefits" at step two of the analysis. *Id*. at 158. If no severe

12  impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Here, ALJ Tielens

13  determined that the evidence established that Plaintiff suffered from severe degenerative disc disease

14  of the cervical spine. (AR 17.) Although Plaintiff stated that he also suffers from vertigo, right knee

15  pain, and low back pain, the ALJ found that these disorders have no more than a minimal effect on

16  the ability to perform basic work functions and are therefore "non-severe." (AR 17.)

17       If the ALJ determines that the claimant has a severe impairment, the process proceeds to the

18  third step, where the ALJ must determine whether the claimant has an impairment or combination of

19  impairments which meets or equals an impairment in the Listing of Impairments. 20 C.F.R. §

20  404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. If a claimant's impairment either meets the listed

21  criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively

22  presumed to be disabled. *Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993). Here, ALJ Tielens

23  found that Plaintiff's medically established disorders are not attended by clinical and laboratory

24  findings that meet or equal any listed impairment. (AR 18.)

25       The fourth step of the evaluation process requires that the ALJ determine whether the

26  claimant's Residual Functional Capacity ("RFC") is sufficient for him to perform past relevant work.

27  20 C.F.R. § 404.1520(e). RFC refers to what an individual can do in a work setting, despite

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   limitations caused by medically determinable impairments.  20 C.F.R. § 416.945(a).  In assessing an

2   individual's RFC, the ALJ must consider his or her symptoms (such as pain), signs, and laboratory

3   findings together with other evidence.  20 C.F.R. § 404, Subpt. P, App. 2 § 200.00(c); Social

4   Security Ruling ("SSR") 96-8p.  Here, ALJ Tielens determined that Plaintiff has the RFC to perform

5   light work, except that he is further limited to occasional climbing of stairs and ramps, overhead

6   work, and crawling with no climbing of ropes, ladders, and scaffolds.  (AR 18.)  After a detailed

7   review of the medical evidence, (AR 18-21), the ALJ determined that Plaintiff retains the RFC to

8   perform his past relevant work.  (AR 22.)

9          In the fifth step of the analysis, the SSA is responsible for providing evidence that

10  demonstrates that there are other jobs existing in significant numbers in the national economy which

11  the claimant can perform consistent with the medically determinable impairments and symptoms,

12  functional limitations, age, education, work experience and skills.  20 C.F.R. § 404.1520(a)(4)(v); 20

13  C.F.R. § 404.1560(c).  Here, the vocational expert testified that the Dictionary of Occupational

14  Titles ("DOT") did not provide the exact job title for Plaintiff's former job but, based on Plaintiff's

15  description of his job, the expert found that it was closely identical to the occupation of sales

16  representative of business services, (DOT Code: 251.357-022), that involved light exertion at the

17  skilled level.  (AR 22, 43.)  The vocational expert also testified that Plaintiff worked as a retail

18  manager (DOT Code: 185.167-046) that was customarily performed at the light physical exertional

19  and skilled level, although Plaintiff described heavy physical demands in his job.  (AR 22, 43-44.)

20  The expert further testified that the demands of Plaintiff's past jobs did not exceed his RFC.  (AR 22,

21  44.)  ALJ Tielens found the vocational expert's testimony consistent with the information contained

22  in the DOT and, therefore, determined that Plaintiff retained the ability to perform his past relevant

23  work.  (AR 22.)  As such, ALJ Tielens determined that Plaintiff is not disabled.  (AR 22.)

24                              **III.  LEGAL STANDARD**

25         This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42

26  U.S.C. § 405(g).  The ALJ's decision must be affirmed if the findings are "supported by substantial

27  evidence and if the [ALJ] applied the correct legal standards."  *Holohan v. Massanari*, 246 F.3d

28

1195, 1201 (9th Cir. 2001) (citation omitted).  "Substantial evidence" means more than a scintilla,

but less than a preponderance, or evidence which a reasonable person might accept as adequate to

support a conclusion.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The court must

consider the administrative record as a whole, weighing both the evidence that supports and detracts

from the ALJ's conclusion.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  However,

where the evidence is susceptible to more than one rational interpretation, the court must uphold the

ALJ's decision.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  Determinations of

credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved

by the ALJ.  *Id*.  Additionally, the harmless error rule applies where substantial evidence otherwise

supports the ALJ's decision.  *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990) (citation

omitted).

## IV.  DISCUSSION

In his motion, Plaintiff argues that the ALJ improperly rejected the opinion of his treating

physician, Dr. Howe.  Specifically, Plaintiff argues that the ALJ impermissibly relied upon the

opinions of state agency physicians that reviewed the same clinical findings as Dr. Howe, as well as

the one-time examination by Dr. Grafe.  Plaintiff contends that this evidence does not provide a

basis to reject Dr. Howe's treating opinion.  Plaintiff also argues that the ALJ was incorrect in his

determination that Plaintiff's daily activities belie Dr. Howe's opinion.  Plaintiff maintains that the

evidence of his daily activities actually supports and is consistent with Dr. Howe's opinion.  The

Court shall consider each argument in turn.

**A.    Whether the ALJ Impermissibly Relied Upon the Opinions of State Agency Physicians and the One-Time Examination by Dr. Grafe.**

In his decision, ALJ Tielens adopted the opinions of the State agency physicians, Thien

Nguyen, M.D., and David Pong, M.D., that Plaintiff retained the exertional capacity to perform light

work functions with limitations of occasional climbing of stairs and ramps, and occasional crawling

with a preclusion to climbing ropes, ladders, and scaffolds.  (AR 19, 214-31, 257-63.)  In doing so,

ALJ Tielens discounted the portion of Dr. Howe's opinion that limited Plaintiff to a sit/stand option,

1    sitting, standing and walking in one hour increments, and no working around vibration.  (AR 20,

2    254-55.)  ALJ Tielens also adopted the opinion of Dr. Grafe, who examined Plaintiff once and found

3    that Plaintiff's complaints, which consisted of persistent numbness, weakness, and tingling in the

4    right upper extremity with neck pain, had significantly decreased by surgery and were of a mild

5    degree.  (AR 20, 319.)

6         In his motion, Plaintiff argues that the State agency physicians' opinions do not constitute

7    substantial evidence which merit the ALJ's decision to give less weight to Dr. Howe's opinion

8    because they rely on the same records considered by Dr. Howe.  (Pl.'s Mot. at 10.)  Plaintiff relies on

9    *Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir. 2007), which provides that "when an examining physician

10   relies on the same clinical findings as a treating physician, but differs only in his or her conclusions,

11   the conclusions of the examining physician are not 'substantial evidence.'"  *Id.*

12        Plaintiff also argues that ALJ Tielens improperly based his opinion regarding Plaintiff's

13   residuals from neck surgery on Dr. Grafe, noting that Dr. Grafe stated that '[c]ounseling Mr. Gurrola

14   on how to address "his current symptoms in his neck would be out of . . . [his] . . . area of expertise."'

15   (Pl.'s Mot. at 11-12, AR 319.)  Plaintiff argues that ALJ Tielens improperly gave weight to Dr.

16   Grafe's opinion that Plaintiff's complaints had significantly decreased and were of a mild degree

17   since that opinion was based on a one-time examination of Plaintiff.  (Pl.'s Mot. at 11.)  Plaintiff

18   further argues that ALJ Tielens should have given more weight to Dr. Eichbaum's opinion that

19   Plaintiff's symptoms included tenderness, muscle spasm, muscle weakness, sensory change,

20   impaired sleep, and reduced grip strength.  (Pl.'s Mot. at 12; AR 325.)  Dr. Eichbaum diagnosed

21   Plaintiff with cervical strain/radiculopathy with symptoms of pain in the bilateral arms and shoulders

22   with neck movement.  (AR 325.)  Plaintiff reasons that Dr. Eichbaum's opinion should be given

23   greater weight because clinical findings supported his opinion, and Dr. Eichbaum agreed with Dr.

24   Howe that Plaintiff's condition is far more limiting than the ALJ determined.  (Pl.'s Mot. at 12.)

25        In response, Defendant argues that ALJ Tielens permissibly rejected Dr. Howe's opinion

26   because the State agency doctors' opinions are consistent with independent clinical findings and

27   objective medical evidence in the record.  (Def.'s Mot. at 7-8.)  In support of this argument,

28

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    Defendant cites to the medical evidence that showed Plaintiff's symptoms improved, including the

2    multiple MRI scans that showed normal alignment, disk spaces, soft tissues, and no specific

3    abnormality or interval change in the vertebrae.  (AR 232-33, 237.)  Defendant also points to the

4    opinions of Drs. Grafe and LaHaye, and Plaintiff's own remarks to Dr. LaHaye that "he sustained

5    relief of his preoperative radicular symptomatology," and that "he was very much better than he was

6    before surgery."  (Def.'s Mot. at 5; AR 19, 232-33, 237.)  Defendant further argues that another State

7    agency physician, Dr. Pong, expressly explained that Dr. Howe's opinion was not supported by

8    appropriate objective findings.  (Def.'s Mot. at 8.)

9         "Cases in [the Ninth Circuit] distinguish among the opinions of three types of physicians: (1)

10   those who treat the claimant (treating physicians); (2) those who examine but do not treat the

11   claimant (examining physicians); and (3) those who neither examine nor treat the claimant

12   (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Here, there is no

13   dispute that Dr. Howe, Dr. LaHaye, and Dr. Eichbaum are all treating doctors.  Generally, a treating

14   physician's opinion should be given more weight than opinions of doctors who did not treat the

15   claimant, because treating physicians are employed to cure and, therefore, have a greater opportunity

16   to know and observe the claimant.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987.)  When

17   the opinion of a treating or an examining doctor is not contradicted by another doctor, the ALJ may

18   reject that opinion only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 830.  If the opinion is

19   contradicted by another doctor, that opinion can only be rejected for specific and legitimate reasons

20   that are supported by substantial evidence in the record.  *Id.* at 830-31.  The ALJ is responsible for

21   resolving any such conflicts in medical testimony.  *Magallanes*, 881 F.2d at 750.  Similarly, the ALJ

22   is responsible for resolving ambiguities in the evidence.  *Id.*  An examining physician's findings are

23   entitled to the same weight when the examination is obtained by the Commissioner as when it is

24   procured by the claimant.  *Lester*, 81 F.3d at 832.

25        In considering medical opinions, the ALJ is required to give weight to medical opinions

26   discussing the "nature and severity of [the claimant's] impairment(s)," but not to a physician's

27   ultimate opinion regarding a claimant's disability or employability status.  20 C.F.R. § 416.927(a)(2);

28

20 C.F.R. § 416.927(e)(1) ("A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.")

In his decision, the ALJ considered the reports of State agency physicians Thien Nguyen, M.D., and David Pong, M.D.  On November 1, 2007, Dr. Nguyen noted that Plaintiff was "very active: doing light vacuuming, dishes and that the RFC finding is light w/ post. limitation is appropriate at this time."  (AR 216.)  In April of 2008, Dr. Pong found that the MSS provided by Dr. Howe was not fully supported with objective evidence, and that Plaintiff retained the capacity to perform light work.  (AR 258.)  In forming their opinions, the State agency physicians relied on different clinical findings than Dr. Howe and concluded that Plaintiff retained the exertional capacity to perform light work.  (AR 214-31, 257-63.)  Specifically, they reviewed medical records not authored by Dr. Howe, including medical records by Dr. LaHaye and physical therapist Robert B. Leavitt, as well as MRIs, and agency documents such as the daily activities functional report that Plaintiff completed, which was further corroborated by the third party functional report that Plaintiff's sister completed.  (AR 119-40, 209, 257-63.)  They also considered the opinion of Dr. LaHaye, a treating doctor who examined Plaintiff after his surgery and "explained to [Plaintiff] that . . . he is doing very well" and he was "pleased with [Plaintiff's] outcome on both clinical and radiographic grounds."  (AR 237.)  Opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).  ALJ Tielens found that both State agency physicians' opinions were consistent with the other evidence in the record; thus, their opinions provide specific and legitimate reasons to reject Dr. Howe's opinion.  *Thomas*,  278 F.3d at 957.

ALJ Tielens also discredited Dr. Howe's opinion because it was not consistent with the record as a whole.  *Morgan*, 169 F.3d at 600.  ALJ Tielens reviewed the medical source statements of Robert B. Leavitt, a physical therapist, and Dr. Howe, and explained that he accorded less weight to their opinions because he found that the minimal residuals post surgery did not support Dr. Howe's and Mr. Leavitt's assessed limitations, and that Plaintiff's daily activities contradicted their

1  limitations. (AR 20.) ALJ Tielens found that the minimal residuals included degenerative changes

2  that supported a capacity for light work. (AR 20.)  The ALJ also found that it included Plaintiff's

3  complaints of persistent numbness, weakness, and tingling in the right upper extremity with neck

4  pain. (AR 20.) In so finding, ALJ Tielens looked to Dr. LaHaye's examinations of Plaintiff  and

5  determined that they supported a capacity for light work, and Dr. LaHaye and Dr. Grafe's

6  postoperative assessments showed good results from the surgery. (AR 19-20.) Dr. LaHaye's

7  progress reports also reflected improvement of the radicular symptoms, which were further

8  corroborated with x-ray evidence of good alignment. (AR 19, 237.) Dr. LaHaye's October 2, 2007

9  followup note indicated that Plaintiff has "had sustained relief of his preoperative radicular

10 symptomatology," and "overall, he is very much better than he was before surgery." (AR 237.)

11 Further, Mr. Leavitt noted that Plaintiff's pain decreased, his range of motion had increased, and that

12 his strength, posture, and ADL improved. (AR 333.) In addition, Dr. LaHaye's postoperative

13 assessment of Plaintiff indicated that he was making progress with his rehabilitation. (AR 237.)

14 Plaintiff had subjectively complained to Dr. LaHaye of discomfort in his neck with some aching and

15 numbness in the right upper extremity, and that he felt "about the same" as he did before surgery, in

16 November 2007. (AR 235.) However, therapy records in January through March 2008 showed that

17 Plaintiff recovered "almost normal" to "normal" functioning. (AR 334, 336, 341-42.) Because this

18 evidence contradicts Dr. Howe's conclusions, the Court finds that it constitutes a specific and

19 legitimate reason supported by substantial evidence in the record to reject his opinion. *Thomas,* 278

20 F.3d at 956.

21     As to the ALJ's decision to rely on Dr. Grafe's opinion, ALJ Tielens found that Dr. Grafe's

22 examination disclosed good results from surgery that support a capacity for light work. (AR 20,

23 318-19.) ALJ Tielens also considered Dr. Grafe's postoperative assessment of Plaintiff in which Dr.

24 Grafe noted that the symptoms in Plaintiff's hand were minimal and had improved, including

25 Plaintiff's own report that 80 to 90% of the numbness in his right arm had resolved. (AR 318-19.)

26 ALJ Tielens explained that he relied on Dr. Grafe's opinion to determine that the complaints relating

27 to Plaintiff's neck pain had significantly decreased by surgery and were of a mild degree. (AR 19-

28

20, 318-19.)  Although Plaintiff argues that the ALJ improperly relied upon this opinion because it was based on a one-time examination, the Court disagrees.  "The number of times a physician has examined a claimant is only a factor in determining the extent of a treating relationship, not an examining relationship."  *Weltch v. Astrue*, 2011 WL 1135930, at *5 (D. Or. 2011).  "This is so because, generally, an examining physician only examines a claimant once.  The suggestion that an opinion is inadequate simply because it resulted from a onetime examination leads to the conclusion that all examining physician opinions should be discarded."  *Id.* (citing *Sprout v. Astrue*, 2011 WL 300210, at *7 (E.D. Cal. 2011); *see also Henderson v. Astrue*, 634 F. Supp. 2d 1182, 1192 (E.D. Wash. 2009) (concluding ALJ's reason for rejecting medical opinions because they were based on one-time examinations was erroneous)).  Thus, the Court finds that it was proper for the ALJ to rely upon Dr. Grafe's opinion.

Plaintiff relies on *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996), in arguing that ALJ Tielens improperly substituted his own judgment in regards to the minimal residuals after Plaintiff's surgery.  (Pl.'s Mot. at 12.)  In *Rohan*, the Seventh Circuit Court of Appeals found that the ALJ had erred when he substituted his own independent judgment in place of the treating doctor's opinion, because he did not expressly rely on any medical evidence or authority.  *Id.* at 970-71.  Here, ALJ Tielens did not substitute his own independent judgment; instead, as discussed above, he relied on the medical evidence of record and explained how Dr. Grafe's opinion was supported by this evidence.  (AR 19-20.)

Further, although Dr. Howe's findings might conflict with the findings provided by other doctors, the ALJ is responsible for resolving any such conflicts in medical testimony.  *Magallanes*, 881 F.2d at 750.  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Embrey v. Bowen*,  849 F.2d 418, 421 (9th Cir. 1988).  As discussed above, the Court finds that ALJ Tielens met this burden and properly rejected Dr. Howe's opinion based on the substantial evidence in the record.

Finally, Plaintiff directs the Court's attention to the treating opinion of Dr. Eichbaum, who,

United States District Court
For the Northern District of California

like Dr. Howe, found that Plaintiff had a significant limitation of motion. (AR 325.) Dr. Eichbaum's March 2007 assessment indicates that Plaintiff has a capacity to lift and carry up to twenty pounds occasionally, stand or walk for four hours in an eight hour day and sit for four hours in an eight hour day. (AR 325-29.) Plaintiff argues that Dr. Eichbaum agreed with Dr. Howe's opinion and diagnosed Plaintiff with cervical strain and radiculopathy with symptoms of pain in the bilateral arms and shoulders with neck movement. (Pl.'s Mot. at 12.) In response, Defendant argues that ALJ Tielens was correct in expressly discounting Dr. Eichbaum's opinion because it was based on conditions - headaches, anxiety, and depression - for which the ALJ found no record to support a diagnosable impairment. (Def.'s Mot. at 4.)

The Ninth Circuit has held that an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings. *Tonapetyan v. Halter,* 242 F.3d 1144, 1149 (9th Cir. 2001) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). In *Tonapetyan*, the Ninth Circuit found that the ALJ properly rejected the doctor's opinion because it was unsupported by rationale or treatment notes, and offered no objective medical findings to support the existence of [claimant]'s alleged conditions. *Id.* Here, ALJ Tielens explained that he discounted Dr. Eichbaum's opinion because it was based on Plaintiff's subjective complaints, including headaches, anxiety, and depression, that were not supported anywhere else in the record. (AR 20, 325-29.) Additionally, he found that the medical record showed that Plaintiff experienced improvements in his symptoms, based on his own statements to the doctors and their post-operative treatment records. (AR 20, 318-19, 336.) Based on this record, the Court finds that ALJ Tielens rejected Dr. Eichbaum's opinion for specific and legitimate reasons that are supported by substantial evidence in the record. *Lester*, 81 F.3d at 830-31. Given the reasons above, the Court finds that ALJ Tielens permissibly relied upon the opinions of State agency physicians and the one-time examination by Dr. Grafe in rejecting Dr. Howe's opinion.

**B.      Whether the ALJ Properly Found that Plaintiff's Daily Activities Belie Dr. Howe's Opinion.**

ALJ Tielens also found that Plaintiff's daily activities, which included caring for his children, driving them to and from school, volunteering at their school, attending their sporting events, as well as performing household chores, such as preparing simple meals, washing dishes, and shopping belied Dr. Howe's limitations. (AR 21.) Plaintiff argues that ALJ Tielens improperly discounted his subjective complaints about his daily activities post surgery because his decision was not based on substantial evidence in the record. (Pl.'s Mot. at 13.) Plaintiff also points to his testimony that he cannot lift more than 10 pounds, and that he has problems with range of motion in his neck, which he asserts is consistent with Dr. Howe's opinion. (Pl.'s Mot. at 13.) In response, Defendant argues that ALJ Tielens' interpretation of Plaintiff's testimony is reasonable and supported by substantial evidence because many of Plaintiff's daily activities directly contradict Dr. Howe's opinion regarding his limitations. (Def.'s Mot. at 7.)

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). "The claimant, however, 'need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.'" *Id.* (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). "Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." *Id.* (quoting *Smolen*, 80 F.3d at 1282).

Second, if the ALJ determines that the claimant has presented objective medical evidence, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (quoting *Smolen*, 80 F.3d at 1281)). Such specificity is crucial so as to enable effective judicial review. *Mersman v. Halter*, 161 F. Supp. 2d 1078, 1086 (N.D. Cal. 2001) ("The lack of specific,

clear, and convincing reasons why Plaintiff's testimony is not credible renders it impossible for [the] Court to determine whether the ALJ's conclusion is supported by substantial evidence"); SSR 96-7p (the ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and reasons for that weight").

The ALJ is to consider relevant factors when determining a claimant's credibility. *See* 20 C.F.R. § 404.1529(c). These factors are: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and the claimant's daily activities. *See* 20 C.F.R. § 404.1529(c), 20 C.F.R. § 416.929(a). The ALJ must also weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors. *Bray v. Astrue*, 554 F.3d 1219, 1227 (9th Cir. 2009). The Ninth Circuit has found that if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations. *Morgan*, 169 F.3d at 599; *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Where the ALJ "has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record," courts must not engage in second-guessing. *Fair*, 885 F.2d at 604.

Here, ALJ Tielens found that Plaintiff presented objective medical evidence of an underlying impairment, in that his cervical spine showed central spinal stenosis at the C5-6 level secondary to central disc bulge with right neural foraminal stenosis and central canal stenosis at the C6-7 level. (AR 18-19.) However, as to Plaintiff's subjective pain, ALJ Tielens found that Plaintiff's daily activities were inconsistent with the severity of the medical symptoms and functional loss described by Plaintiff, and his subjective complaints about his pain were inconsistent with Dr. Howe's limitations. (AR 21.) ALJ Tielens found that the Plaintiff's activities, corroborated and described by

United States District Court
For the Northern District of California

his sister, which included experiencing pain, the inability to sit for long periods, and numbness of his hands, all invalidated his self-reported daily activities.  (AR 21.)

In reaching a credibility determination, an ALJ may weigh consistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors. *Bray*, 554 F.3d at 1227.  The ALJ may use inconsistencies in a claimant's reported symptoms and activities to support the ALJ's adverse credibility finding and to justify his decision to discount some of a claimant's subjective complaints.  *Berry v. Astrue*, 622 F.3d 1228, 1235 (9th Cir. 2010.)  In *Berry*, the ALJ found that the plaintiff's self-reported activities contradicted "his hearing testimony that he regularly needed to lie flat on his back and relied on friends for cooking and cleaning." *Id.* at 1235.  The claimant "told medical staff he engaged in daily walks of a mile or more, had various social engagements, drove his car and did crossword puzzles, computer work, pet care, cooking, laundry and other house-keeping." *Id.*.  The Ninth Circuit found that the "inconsistencies in Berry's reported symptoms and activities adequately support the ALJ's adverse credibility finding and justify his decision to discount some of Berry's subjective complaints." *Id.*; *see also Bray*, 554 F.3d at 1227 ("The ALJ made specific findings to support his decision to discount [the claimant's] testimony due to her active lifestyle, including 'cleaning, cooking, walking her dogs, [and] driving to appointments'").

Plaintiff's inconsistencies in this case include continued complaints of numbing in both arms, especially when driving, despite the fact that he drove his children to school regularly.  (AR 31, 133.)  In addition, Plaintiff complained that he was not able to sit for more than 10 to 20 minutes at the most without feeling his rear go numb, even though he testified that he attended his children's sport activities up to six times a week.  (AR 32, 134.)  He also testified that he feels like there is a constant weight pulling on him in his shoulders and neck, and he feels pain in his arms when lifting objects that are more than ten pounds, even though he volunteers at his children's school and performs household chores.  (AR 33, 133-37.)  In addition, in Plaintiff's work history report, he described walking one to two miles without needing to take a rest.  (AR 138.)  This is further corroborated by Dr. Nguyen's Physical RFC Assessment dated November 1, 2007, in which she

**United States District Court**
For the Northern District of California

noted that Plaintiff was "very active: doing light cleaning, vacuuming, dishes." (AR 216.) The Court finds that Plaintiff's performance of household chores serves as evidence that Plaintiff retains the capacity to work. *See Morgan*, 169 F.3d at 600 (ALJ found that claimant's ability to fix meals, do laundry, work in the yard, and care for his friend's child served as evidence of claimant's ability to work). Based on this evidence, the Court finds that ALJ Tielens properly discredited Plaintiff's allegations based on Plaintiff's daily activities post-surgery.

Plaintiff also testified that he continued to look for work as an independent contractor and was self-employed, even though he complained of significant stress associated with these two jobs. (AR 27-28.) Plaintiff testified that he continued to work starting in October 2008, and at the time of the hearing, he admitted to engaging in employment as an independent contractor, even though he made no money. (AR 28.) The Court finds that ALJ Tielens correctly discounted Plaintiff's testimony based on such internal contradictions. *See Bray,* 554 F.3d at 1227. ("The ALJ made specific findings to support his decision to discount [the claimant's] testimony," including that she "recently worked as a personal care giver for two years, and has sought out other employment since then"). Because ALJ Tielens' interpretation of Plaintiff's self-reported daily activities post-surgery and his testimony is supported by substantial evidence, it is not this Court's role to second-guess it. *See Rollins v. Massanari,* 261 F.3d 853, 857 (9th Cir. 2001) *(citing Fair*, 885 F.2d at 604). Thus, the Court finds that ALJ Tielens reasonably relied on Plaintiff's daily activities post surgery to reject Dr. Howe's opinion.

## V. CONCLUSION

Based on the foregoing analysis, the Court hereby DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated: August 3, 2011

_____
MARIA-ELENA JAMES
United States Magistrate Judge